41 P.3d 157

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Dean MARA, Defendant–Appellant.**

No. 22413.

Supreme Court of Hawai'i.

Feb. 15, 2002.

As Amended Feb. 20, 2002.

2

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, on the briefs, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., RAMIL, and ACOBA, JJ.

Opinion of the Court by MOON, C.J.

On March 11, 1999, following a jury trial presided over by the Honorable Dexter Del Rosario, defendant-appellant Dean Mara was convicted of: manslaughter, in violation of Hawai'i Revised Statutes (HRS) § 707–702(1)(a) (1993)[1]; reckless endangering in the first degree, in violation of HRS § 707–713 (1993)[2]; and place to keep firearm, in violation of HRS § 134–6(c) (Supp.1996).[3]

---

**1.** HRS § 707–702(1)(a) states that "[a] person commits the offense of manslaughter if ... [h]e recklessly causes the death of another person[.]"

**2.** HRS § 707–713(1) states:
   A person commits the offense of reckless endangering in the first degree if the person employs widely dangerous means in a manner which recklessly places another person in danger of death or serious bodily injury or intentionally fires a firearm in a manner which recklessly places another person in danger of death or serious bodily injury.

**3.** HRS § 134–6(c) states in relevant part:

On appeal, Mara argues that his convictions should be reversed because the trial court erred by: (1) disqualifying fifty-one prospective jurors who admitted having knowledge about the present case without permitting counsel to question them; (2) denying Mara's motions for continuance and mistrial when the defense was unable to locate a witness whose existence was not disclosed until trial; and (3) failing to grant a mistrial based on the deputy prosecutor's improper remarks during rebuttal argument concerning the presumption of innocence. For the reasons set forth below, we affirm Mara's conviction and sentence.

## I. BACKGROUND

This case arose out of a "drive by" shooting incident that occurred on January 15, 1997, in which Mara, who was a passenger in a car driven by Vanessa Joseph, shot and killed Stella Jensen, a passenger in a car driven by Gary Akopian.

On June 17, 1997, Mara was indicted on charges of: murder in the second degree of Jensen (Count I); attempted murder in the first degree of Jensen and Akopian (Count II); attempted murder in the second degree of Akopian (Count III); possession of a firearm by a person convicted of certain crimes (Count IV); possession of ammunition by a person convicted of certain crimes (Count V); and place to keep loaded firearm (Count VI).

### A. Jury Selection

It was undisputed by the parties that this case received extensive pretrial publicity, including considerable television, radio, and newspaper coverage. According to Mara's May 22, 1998 statement on pretrial publicity, the news media reported, *inter alia*, that shots were fired from a passing car, leaving one person dead, and that, shortly after the shooting, police located the suspect car, which had been burned and abandoned in the Wai'anae area.

[A]ll firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the

At a May 22, 1998 pretrial hearing, the trial court informed the prosecution and defense of its intended method of obtaining a sufficient number of potential jurors in the jury venire to ensure that a jury could be impaneled. Specifically, the court indicated:

From the court's experience, the court believes that given the nature of this case and there being twelve peremptories to decide the court needs a minimum number of 80 jurors to begin jury selection in order to assure completion of jury selection without the need of obtaining additional panels necessary from jury pool.

As a practical matter, this court is able to seat a maximum of approximately 85 jurors.

And because there was pretrial publicity in this case, the court also anticipate[s] that there may be jurors that have heard about this case necessitating individual [v]oir [d]ire.

In addition, the nature of the charges and the approximate length of the trial, two weeks, may also result in greater reluctance in jurors to serve on this particular case.

For that reason, the court has asked the jury pool [staff] to summon a larger than normal pool of jurors.

What I've been informed by the jury pool staff is that they have summoned two hundred one jurors for all of the trials beginning on Tuesday, May 26th. We will not know how many jurors will show up until that day.

Jury pool staff [have] also informed the court that they will need a minimum of 85 jurors from this pool to serve on the other courts.

So this will be the tentative procedure the court will follow:

On Tuesday morning the court will address the entire jury panel that was summoned [for jury duty] at nine o'clock. There will not be any court reporter present. Counsel need not be present, but

place of purchase to the purchaser's place of business, residence, or sojourn, or between these [and certain other limited, specified locations]. . . .

they are welcome to be present to observe the process.

The court will have the clerk administer the jury oath to answer truthfully all questions concerning their qualifications to serve as jurors.

The court will also inform the jury of the charges, the title of the case, ... and the approximate length of the trial of eight days or two weeks from May 26th to June 5th with the possibility that it may go into the week of June 8th.

The court will inform the jury that there was media coverage of this case.

The court will then read a statement which [Defense Counsel] has prepared.

. . . .

The court will then read the statement to the jury to refresh their recollection of whether they had heard about this case from the media or any other sources.

And this prepared statement will be made a part of the record.

. . . .

Now, depending on the number of jurors who indicate they have heard about this case, the court will instruct all or part of those jurors who have heard about this case to serve on the other trials that are scheduled for that date.

And in the event that there is more than 85 jurors remaining who will be available for this trial, any [excess] jurors will also be sent to [other] courtrooms.

Both counsels objected to the court's proposed procedure on the grounds that (1) HRS § 635–27 (1993), pertaining to a party's right to examine potential jurors, *see infra*, gives each party the right to examine potential jurors for cause and (2) this court, in *State v. Echineque*, 73 Haw. 100, 828 P.2d 276, *reconsideration denied*, 73 Haw. 625, 832 P.2d 1129 (1992), determined that trial courts must strictly comply with the statutory requirements set forth in HRS chapters 635 (pertaining to trial procedure) and 612,

part I (pertaining to selection and service of jurors). Additionally, Mara argued that the court's proposed method of narrowing the jury pool violated HRS § 612–4 (1993), *see infra*, which sets forth specific grounds for the qualification and disqualification of a juror, because the statutory grounds for disqualification do not include disqualifying a juror based on pretrial publicity. Mara also objected on the grounds that the procedure violated his rights to due process and to trial by an impartial jury.

In response to the objections, the court stated:

> If you can—both counsel can show me in the statute that what this court proposes violates the impaneling of jurors, I may agree with you. But you need to point out [to] the court specifically about the law.
>
> [Echinique] referred to the struck jury method.[4]
>
> . . . .
>
> What I'm doing is clearly not a struck jury method.
>
> I'm trying to find a way to bring 85 people in to this courtroom. You will have a chance to question all of these people, if we get that far.
>
> If I could fit 200 people, I would bring them in here. But when these courtrooms were built, they were not built for high publicity cases.
>
> So I had to come up with a system.
>
> In addition, we have a budget. We—All of the courts cannot summon as many jurors as they want.
>
> So jury pool has summoned a large panel [of] 200 citizens. And we hope to use it efficiently so that we can have jurors for all of the trials that are set on Tuesday.
>
> The court is trying to find some method in which I can have jurors available for which we can select twelve fair and impartial people to decide this case, do it efficiently, and also have jurors from this pool

4. Under the "struck jury" system used by the trial court in *Echineque,* at the time a prospective juror was removed for cause, the parties were aware of the identity of the prospective juror replacing the removed individual. *See Echi-* *neque,* 73 Haw. at 102, 828 P.2d at 277. The court in *Echineque* held that such a practice was contrary to HRS § 635–26(a) (1985), which required that replacement jurors be randomly selected. *See id.* at 106, 828 P.2d at 279.

available so the other courts can start rather than I take all 200 people.

And, as a practical matter, I cannot fit them in this courtroom unless we have jury selection someplace else.

And you're telling me that under the law we have to question all 200 people.

Finally, after considering the memoranda submitted by counsel and hearing all of the argument, the court overruled the objections, stating:

With respect to the State's concern that they would be having—by following this method the court would be selecting jurors who are uninformed, the court does not necessarily agree with that position.

What I would be excluding from this trial is jurors who have heard about this case. That means jurors who have not [sic] seen any media coverage. This does not mean that the court would be excluding jurors who are not educated, doesn't read other parts of the newspaper or watch other things in the news or books that they read.

If you are seeking a particular type of juror, you will have the jury cards. You will have an opportunity to question them regarding educational background, literature that they read, opinions that they may have, the whole gamut of questions that may be available to you to determine whether they can be fair and impartial.

The court then instructed both counsel to be present at the proceeding and stated that it would put the substance of the proceeding on the record. For various reasons not pertinent to this appeal, the trial was continued and eventually set for the week of December 7, 1998.

Early on December 7, 1998, the judge and counsel met with the potential jurors summoned to serve in trials on that day. The court later placed on the record the following statement concerning the meeting, which both counsel agreed was accurate:

[T]he court went down to the jury pool to address the jurors that were summoned to

serve on this particular case. There were 214 jurors that had been summoned for this trial. There were 50 no-shows, so there was a total of 164 jurors or potential jurors present in the jury pool.

. . . .

... The court did explain to the jurors the reason why such a large number of jurors had been summoned and that was for the reason that we would not know until they arrive as to what the total number we were able to work with. Also given the nature of the case and the two weeks that there was pretrial publicity in this case warranted such a large number.

. . . .

... The court then read a pretrial publicity statement which was substantially similar to the one that was submitted by [defense counsel]. The only addition was that I did indicate to the jury that it was a female passenger in the vehicle that was shot and died, and that was not identified by [defense counsel's] pretrial publicity statement. And I did inquire as to whether any of these individuals had heard about this case.

There was 51 jurors that raised their hand indicating that they heard about this case either through the news media or through any other sources such as relatives, friends, and co-workers. As a result there was a remaining hundred and thirteen jurors that were remaining that have not heard about this case.

The court had determined that at most we could sit in this courtroom with a hundred jurors given the arrangement of chairs and setup of this courtroom. For that reason what the court did was I had sent the 51 jurors that had heard about this case and the additional 13 jurors[5] for a total of 64 jurors back to jury pool to be sent to the other courts this morning that needs jurors. The court has retained one hundred jurors for this trial.

Defense counsel reiterated his objection to the court's method for the record, stating:

5. The record does not disclose how the court determined which 13 of the remaining jurors

would be sent back to the jury pool.

[T]hose 51 people that were excused were 51 people who we do not know enough about except other than the fact that they heard about the case. They could have heard about the case through news media or through friends or family.

... [T]hose people, I would argue to the court, are the type of people who would tend to keep up with current events and should not be excused solely on that basis. They may well have been fair jurors or they may make up a certain population. They may be at a higher education level. They may be of a certain gender. More women than men may do that. More highly educated people may tend to read the media and so forth. So it may have interfered with the cross-section of the community. And insofar as I'm not aware of any statute that authorizes that, I object for those reasons.

The prosecution voiced no further objection.

Subsequently, jury selection began using the group of 100 persons that the court had directed to the courtroom for this case. At the conclusion of jury selection, defense counsel waived his final peremptory challenge. The record contains no objection to the jury that was ultimately impaneled.

### B. *Trial*

The following evidence was adduced at trial. Mara acknowledged that several days before the shooting, he stole several items from Akopian while Mara, Akopian, and others were staying in a hotel room in Waikīkī.[6] Both Mara and Akopian agreed that Mara stole several thousand dollars and Akopian's car. Mara also claimed that he stole drugs and a firearm from Akopian; Akopian declined to respond to questions concerning whether any drugs were taken from him by Mara or whether he had been in possession of certain types of firearms, citing his privilege against self-incrimination. Akopian did acknowledge that: (1) he was angry with Mara; (2) he probably threatened Mara when Mara called him the day after the theft; (3) he had spoken to and enlisted the

help of several people trying to locate Mara; and (4) he had told Mara's friends that something bad would happen if Mara did not return his property. For example, Akopian admitted that he went to Mara's girlfriend's house, demanding that his possessions be returned and also stating that someone would get hurt if Mara did not return the car. Mara indicated that Akopian had threatened him over the phone, stating that he (Akopian) had put out a fifty-thousand dollar contract to kill him. Mara also stated that Akopian had threatened Mara's family members, including his mother. Mara considered the threats to be real, in part, because "I know [Akopian] had [a] firearm charge that he just beat." Akopian, however, denied that he had put out a contract on Mara. Mara returned the car to Akopian through friends sometime before the day of the shooting.

Mara stated that on the day of the shooting, he received a message that Akopian was still looking for him. Shortly thereafter, Mara and Joseph, who was driving Mara around that day, went to visit Jensen, the eventual victim and an acquaintance of Akopian's, at Jensen's residence. Mara stated that the purpose of visiting Jensen was to see if Akopian had "stopped by over there or not."

Later that day, Joseph was driving on Farrington Highway in Nānākuli with Mara in the front passenger seat when Mara saw Akopian's car at a grocery store. Mara had a gun in the car that he had obtained a couple of days earlier for protection. Upon seeing Akopian, Mara grabbed the steering wheel, and the car turned around to face Akopian's car. Mara stated that he initially was focused only on Akopian, who was behind the wheel, but subsequently realized, before any shots were fired, that another person was in the car. Mara stated that he saw Akopian reach downward and believed that Akopian was reaching for a gun. Mara stated that the reason he thought Akopian was reaching for a gun was that he knew Akopian carried weapons and that Akopian

---

**6.** Mara did not testify at trial, but a videotape of Mara's statement to police was received in evidence and shown to the jury.

had threatened Mara and his family. Mara acknowledged that he never actually saw a gun in Akopian's hands. Mara pulled his own gun out of the glove box and fired shots towards Akopian's car as Akopian tried to drive off. Mara further acknowledged that he was aware that Akopian's car had a standard transmission and that Akopian would need to use one hand for the steering and one for the stick shift as he drove. In his statement to police, Mara indicated that he aimed the gun at the hood, fender, and tires of Akopian's car in order to scare Akopian.

Joseph testified that Mara's gun was located in a bag on the floor of the car. According to Joseph, Akopian reached for something with his right hand under his car seat, and she believed she saw a gun in Akopian's left hand, which was in the air. She then heard Mara's gun "go off." She also testified that both cars were face-to-face and were not in motion when the first shot was fired. Mara then told her to "get out of here" and, while she reversed, Mara fired three more shots out of the window. Joseph also stated that she saw "fire—like one fireworks like one firecracker" from Akopian's car. Notwithstanding the foregoing testimony, Joseph acknowledged that she had given several earlier statements to the police that were inconsistent. She admitted that she had first denied she was even present at the scene of the incident and then, in a second statement, had claimed that she had been present and thought Akopian had a gun and, finally, in a third statement, had expressed the belief that Akopian had not had a gun, but rather a celluar phone, in his hand.[7]

Akopian testified that Jensen, the victim, was a passenger in the car he was driving on the evening of the shooting and that she had just re-entered the car after they stopped briefly in a parking lot. As Akopian started to drive out of the area where they were parked, he saw Mara's car make a U-turn on Farrington Highway and head towards his location. As Akopian tried to drive off, a shot was fired from the approaching vehicle. As the approaching vehicle passed by, four

more shots were fired. Akopian had a clear view of Mara hanging out of the passenger window and firing shots as the car passed by. Akopian believed that the last shot hit Jensen. Akopian drove his car a short distance, stopped, jumped out, and yelled to neighbors to call paramedics. Akopian declined to answer a question regarding whether he had a firearm on his person that day, again invoking his privilege against self-incrimination, but testified that he was not reaching for anything at the time of the shooting. Police tests of Akopian's hands for gunshot residue conducted approximately two and one-half hours after the incident were negative. Akopian also testified that he had a cell phone with him that day as well.

After getting out of his car to summon neighbors for help, Akopian testified that he removed beer belonging to his girlfriend from the trunk of his car because he wanted to dispose of it due to the fact that he was on parole and was not supposed to possess alcohol. At the time he stopped his car, he was also talking on his cell phone to his girlfriend. He denied allegations, discussed *infra*, that he had called someone to come and retrieve guns from him and denied transferring weapons from his vehicle to another car before the police arrived. In response to a question regarding why he did not use his cell phone to call "911" when Jensen had been shot, he stated that he had already asked neighbors to call for help.

During cross-examination, Akopian acknowledged that he had been paroled just three months before the shooting, having been imprisoned for promoting a dangerous drug in the first degree and a firearms charge. He acknowledged that the prosecutor had refused to give him immunity, that without such immunity he "fear[ed] prosecution[,]" and that he was aware of the fact that if it were determined that he had he "done something illegal" while on parole, he could be returned to prison for the remainder of his twenty-year prison sentence.

---

7. According to Joseph, the basis of her third statement was that, during the period between her second and third statements to police, she had spoken with someone who claimed to have been talking on the phone to Akopian at the time of the shooting, so Joseph assumed that the object she saw in Akopian's hand must have been a cellular phone.

Jensen's autopsy revealed that she had died from a gunshot wound to the head and that the gunshot originated from outside the vehicle in which she was riding. A detective who investigated the shooting testified that officers were unsuccessful in locating witnesses in the neighborhood where the shooting had occurred who were willing to make a formal statement.

## C. *Potential Exculpatory Evidence*

On December 10, 1998, in the afternoon of the first day of the State's presentation of evidence, the deputy prosecutor called defense counsel over to listen to possible exculpatory evidence that was being revealed by Honolulu Police Department Officer Perez (Officer Perez), who had testified earlier that morning regarding his investigation of the case. In a hearing out of the jury's presence, defense counsel then informed the court of what Officer Perez had just related for the first time:

[T]he night before the shooting ... Officer Perez was involved in a traffic stop which involved Gary Akopian and Stella Jensen. If I recall correctly Officer Perez was going to issue a ticket. It was late at night. [Officer Perez] asked Mr. Akopian for his license. Officer Perez accompanied Mr. Akopian to the trunk to the back of the car to retrieve the license from the trunk.

According to Officer Perez, Akopian opened the trunk partially at which point using his flashlight Officer Perez could see that there was some items that were stacked under a tarp. [Officer Perez] couldn't see what was under the tarp, but he noticed that Gary Akopian suddenly closed the trunk and said that he believed his license was not in the trunk. Perez issued the traffic ticket and left. So Officer Perez said that he ticketed Mr. Akopian anyway and sent Mr. Akopian and Ms. Jensen on their way.

The following evening ... [w]hen Officer Perez [responded to the scene of the shooting], he encountered a group of people from the area and they told him that they did not think Mr. Akopian had any class because while Mr. Akopian had a cellular phone, instead of calling 911 for the victim

[Stella Jensen], Mr. Akopian called one of his friends. And they also told Officer Perez that subsequently a car drove up, and these people claimed they saw Mr. Akopian transferring guns from his car to this other car.

Subsequently, Mara moved for a mistrial, or alternatively, a continuance, because he wanted to make an attempt to find the newly disclosed witnesses or at least research the issue of a possible motion to dismiss based on the loss of exculpatory evidence.

In opposing Mara's motion for mistrial, the prosecutor clarified certain points:

[I] believe Officer Perez said he saw a gray tarp the night of the speeding ticket. He didn't see anything underneath it. He just saw a gray tarp before Mr. Akopian closed the trunk.

And then also he indicated that the car, according to these people he talked to, there were guns that were transferred from Mr. Akopian's car to the trunk of this other car which then left the scene before the police came. And I asked if there's a description of the guns, and he said the people only said a rifle.

Also, Officer Perez indicated that he asked several of these individuals to make out an HPD 252 statement form and that when he did that ... [he] indicated that none of these witnesses wanted to come forward.

The prosecutor did not object to a continuance if defense counsel wished "to explore the issue of trying to find [the witnesses]" with Officer Perez's help.

The trial court took the matter under advisement and ordered the trial to proceed. The court advised defense counsel to further investigate the information Officer Perez had revealed and ordered the prosecutor to cooperate fully with defense counsel's investigation.

On December 17, 1998, at a hearing outside the presence of the jury, defense counsel updated the court regarding the progress made in ascertaining witnesses with respect to Officer Perez's information. Defense counsel represented that, with the assistance of Officer Perez, his investigator went to

twelve homes in the area where the people appeared from on the night of the shooting, but was unable to locate any witnesses.

At the same hearing, Officer Perez testified that, following his testimony on the morning of December 10, 1998 and while he was between the courtroom's double doors, he informed the prosecutor about certain statements which were made to him by unknown people at the scene after the accident occurred. He testified that, initially, he had not lent any credibility to the statement of a woman who had told him that Akopian removed weapons from his car because he had investigated complaints in the immediate vicinity of the shooting on previous occasions and that, even though "there would always be mention of a weapon[,]" individuals in the area would not cooperate with further investigations:

> I kind of figured: Well, this is one of those where somebody just had something to say, you know, just wanted to get in the act.

However, Officer Perez changed his mind and decided to tell the deputy prosecutor about the statements because he "really started thinking about it" and decided that it was better to mention it. Officer Perez testified that Akopian had aroused his suspicion the night before the shooting when he had quickly closed the trunk of his car before the officer could see in it.[8] In addition, Officer Perez testified that, after the shooting, a woman told him that Akopian had been yelling for someone to call "911" even though he was talking to someone else on his cell phone. A few minutes later, another car pulled up next to Akopian's vehicle, and they transferred guns from Akopian's trunk to the other car. However, when asked to make a statement, she refused, stating, "Oh, fuck that[,]" and walked away. When Officer Perez asked other people if they had seen what the woman had seen, they responded, "Nah. We no like be involved." These people would not provide him with their names.

The trial court ruled that Mara had not shown that the witness sought was available and willing to testify or that the denial of a continuance would materially prejudice Mara, rejecting Mara's contention that the witnesses' statements regarding guns in the trunk were critical to his theory that he acted in self-defense because it would have corroborated his statement to the police that he believed Akopian was reaching for a gun when the shooting occurred. The court subsequently denied Mara's mistrial motion, dismissing his argument that Officer Perez's late disclosure of the evidence had seriously prejudiced him. The court, however, indicated that it would permit Officer Perez to testify regarding what the witness stated to him, not for the truth of the statement but to show that this information was given to Officer Perez.

When trial resumed later that day, Honolulu Police Department Detective Harold Fitchett testified that, despite attempts to interview witnesses during the investigation of the incident, "nobody would come forward and sit down with the officers to write out a statement in a formal form." Fitchett acknowledged that efforts were made by officers to follow up on information received from people at the scene that Akopian was seen "running from his car carrying something in his hands" and "handing it off to someone in the nearby area." However, these efforts were unsuccessful.

Officer Perez's testimony before the jury regarding the witnesses' statements, particularly the details about Akopian talking on the cell phone and transferring weapons from his trunk, was substantially the same as his testimony at the hearing out of the jury's presence. At the conclusion of Officer Perez's testimony, the court instructed the jury that Officer Perez's recitation of the statements made by persons not present in court should not be considered for the truth of the matter but to show that they were made to Officer Perez. Thereafter, Mara renewed his alternative motions for a continuance or mistrial, both of which the court denied.

---

8. Officer Perez testified that he did not believe he had sufficient justification to order Akopian to open the trunk.

D. *Rebuttal Argument, Conclusion of Trial, and Judgment*

Mara objected to the deputy prosecutor's rebuttal argument, the details of which are described *infra*. Among the jury instructions delivered by the court was a self-defense instruction that tracked the appropriate statutory language. On December 22, 1998, the jury found Mara guilty of: (1) reckless manslaughter as a lesser-included offense of murder in the second degree for the killing of Jensen (Count I); (2) reckless endangering as a lesser included offense of attempted murder in the second degree of Akopian (Count III); and (3) place to keep loaded firearm (Count VI). Mara was acquitted of attempted murder in the first degree (Count II) and possession of firearm by a person convicted of certain crimes (Count IV).[9] Final judgment was entered on March 11, 1999, and Mara timely appealed.

## II. *STANDARDS OF REVIEW*

A. *Statutory Interpretation*

■ The interpretation of a statute is a question of law that is reviewed de novo. *State v. Baron*, 80 Hawai'i 107, 113, 905 P.2d 613, 619, *reconsideration granted, in part*, 80 Hawai'i 187, 907 P.2d 773 (1995).

B. *Constitutional Law*

■ This court interprets constitutional claims *de novo*. *State v. Lau*, 78 Hawai'i 54, 58, 890 P.2d 291, 295 (1995).

C. *Motion for Continuance*

■ A denial of a motion for continuance is within the sound discretion of the trial court. *State v. Rogan*, 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999). The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. *State v. Alston*, 75 Haw. 517, 538–39, 865 P.2d 157, 168 (1994).

9. Count V was dismissed by the prosecution.

D. *Motion for Mistrial*

■ The denial of a motion for mistrial is discretionary on the part of the trial court. *State v. Loa*, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272, *reconsideration denied*, 83 Hawai'i 545, 928 P.2d 39 (1996).

E. *Prosecutorial Misconduct*

■ The denial of a motion for mistrial based upon prosecutorial misconduct is within the sound discretion of the trial court. *Rogan*, 91 Hawai'i at 411, 984 P.2d at 1237.

## III. *DISCUSSION*

A. *Jury Selection*

As previously indicated, the trial court released fifty-one potential jurors from the jury venire based upon their admission of having heard of the case, without permitting counsel to question them. On appeal, Mara contends that he was denied a fair trial because the selection procedures violated: (1) chapter 612, specifically HRS §§ 612–4 and 612–7, which specify reasons for disqualification and exemption of jurors, respectively; (2) HRS § 635–27, which guarantees a party's right to question potential jurors; and (3) his right to due process and a fair and impartial jury. We disagree.

### 1. Chapter 612

Chapter 612 largely sets forth the method by which jurors are summoned for service. Each year, the clerk of court for each circuit compiles a master list of potential jurors from voter registration and other lists of residents. *See* HRS § 612–11(a) (1993). From this list, the clerk randomly selects names and places them in a "master jury wheel," *see* HRS § 612–12 (1993), which is "a physical device or electronic system for the storage of names" of prospective jurors. HRS § 612–3 (1993). From the names in the master jury wheel, the clerk sends out qualification forms to each potential juror, and, on the basis of the responses obtained, determines which persons are "qualified" according to law to serve as jurors. *See* HRS §§ 612–13 (1993) and 612–14(a) (1993). HRS

§ 612–4 (Supp.1996) specifies juror qualifications as well as grounds for disqualification:

(a) A prospective juror is qualified to serve as a juror if the prospective juror:

- (1) Is a citizen of the United States and of the State, eighteen years old, and a resident of the circuit; and

(2) Is able to read, speak, and understand the English language.

(b) A prospective juror is disqualified to serve as a juror if the prospective juror:

(1) Is incapable, by reason of the prospective juror's physical or mental disability, of rendering satisfactory jury service; but a person claiming this disqualification may be required to submit a physician's certificate as to the disability, and the certifying physician is subject to inquiry by the court at its discretion;

(2) Has been convicted of a felony in a state or federal court and not pardoned; or

(3) Fails to meet the qualifications in subsection (a).

In addition, persons may be "excused" by the clerk, with approval of the court, for cause when it appears that jury duty would entail a serious personal hardship or for other good cause. HRS §§ 612–7 (1993) and 612–14(b).

Names of those persons qualified and not excused are placed in the "qualified jury wheel." *See* HRS § 612–14(b). From the qualified jury wheel, the clerk prepares individual lists of citizens. *See generally* HRS § 612–15 (1993). From these lists, individuals are summoned to appear for selection and impanelment in individual trials, as the need arises. *See* HRS §§ 612–17 (1993) and 612–18 (1993).[10] It appears from the record that it was at this stage that the court addressed the 164 potential jurors who appeared at the courthouse.

The exclusive process [11] by which a party may challenge violations of the jury selection procedures in chapter 612 is outlined in HRS § 612–23(b) (1993), which states in relevant portion:

Upon motion filed ... containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with this chapter, the moving party is entitled to present in support of the motion the testimony of the clerk, any relevant records and papers not public or otherwise available used by the clerk, and any other relevant evidence. If the court determines that in selecting either a grand jury or a trial jury *there has been a substantial failure to comply with this chapter and that the moving party has been prejudiced thereby*, the court shall stay the proceedings pending the selection of the jury in conformity with this chapter, quash an indictment, or grant other appropriate relief.

(Emphases added). According to subsection (b), in order to prevail on his claim that the selection process for prospective jurors violated HRS chapter 612, Mara must show that: (1) there was a substantial failure to comply with chapter 612; and (2) he was prejudiced by such failure. Mara has shown neither.

The 164 potential jurors who reported for jury duty were chosen through the random selection process set forth in chapter 612. Nonetheless, Mara contends that, because HRS § 612–4 does not specifically authorize the disqualification of jurors based on a summoned juror's knowledge of the case for which he or she is selected, the trial court erred in doing so. However, HRS § 612–4 is inapplicable to the circumstances of this case. HRS § 612–4 provides the grounds for disqualifying jurors from serving on *any* jury. Similarly, HRS § 612–7, which Mara also contends was violated, authorizes a potential juror to be excused from jury duty due to the

---

**10.** HRS § 612–17 prescribes detailed procedures for summoning potential jurors in the first circuit; HRS § 612–18 prescribes the process for the state's other judicial circuits. *See* HRS §§ 612–17 and 612–18.

**11.** HRS § 612–23(c) (1993) states:

The procedures prescribed by this section are the exclusive means by which a person accused of a crime, the State, or a party in a civil case may challenge a jury on the ground that the jury was not selected in conformity with this chapter.

personal hardship he or she would incur if required to serve.[12] Neither of these statutes are relevant to the circumstances of the case at bar because the jurors in the venire were neither disqualified nor excused from *jury duty*. Rather, they were reassigned from the jury venire for this specific case to other trials occurring that day. Thus, we do not believe that the trial court's procedure constituted a "substantial failure to comply" with the provisions of chapter 612. HRS § 612–23(b).

Admittedly, the judge's decision to reassign fifty-one of 164 potential jurors to other courtrooms was an occurrence not contemplated by the statutes governing juror selection. However, as implicitly recognized by HRS § 612–23(b), such an occurrence does not necessarily render the process invalid or the trial unfair. *See* HRS § 612–23(b) (requiring a showing of "prejudice" in addition to a "substantial failure to comply" with chapter 612 before relief can be granted).

In *Territory v. Chung Nung*, 21 Haw. 66 (1912), a case involving an irregular procedure adopted by a judge, this court stated:

> [T]he excusing of jurors prior to service of summons and of the court's own motion, if not contemplated by the provisions of the statute [governing juror selection], is, at most, a mere irregularity of which a defendant under indictment has no reason to complain, if the [jury] . . . as finally constituted is composed wholly of qualified persons, and if the defendant is not injured by the proceedings.

*Id.* at 68–69. In *Chung Nung*, the applicable statute provided in relevant part that the clerk "shall call the names of those summoned, and the court may then hear excuses of jurors summoned." Rev. Laws Haw. § 1784 (1905). However, the judge summarily excused twelve persons from service on a grand jury panel after their names had been drawn by lot but before the summons was served and selection commenced. *Id.* at 66–67. The jurors were excused primarily for reasons of convenience before they requested to be excused. *Id.* Although this court concluded that the procedure was irregular and not contemplated by the statute, it held that the irregularity did not warrant the quashing of the indictment entered by the grand jury. *Id.* at 68–69. Similarly, if the jury finally impaneled in the case at bar consisted wholly of qualified jurors, a mere irregularity in the process is not itself a ground for reversal, absent a showing of improper motive or prejudice.

■ Consistent with this view, we note that, generally, the circuit courts are vested with considerable discretion in the matter of excusing persons from jury service. *See State v. Crisostomo*, 94 Hawai'i 282, 287, 12 P.3d 873, 878 (2000) (citing *State v. Jones*, 45 Haw. 247, 262, 365 P.2d 460, 468 (1961)). Absent an abuse of that discretion, the judge's decision will not be disturbed. *Crisostomo*, 94 Hawai'i at 287, 12 P.3d at 878.

Analogously, we believe that the trial court's practical attempt[13] to deal with the logistical concerns involved in impaneling a jury in this case is reviewable under the abuse of discretion standard and should, therefore, not be disturbed unless the court "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (internal quotation marks omitted). Mara offers no evidence that the trial court's decision was detrimental to him. *See Territory v. Fukunaga*, 30 Haw. 697, 705 (1929) (trial court's possible error in improp-

---

12. HRS § 612–7 states:

   A juror shall not be excused by a court for slight or trivial cause, but only when it appears that jury duty would entail a serious personal hardship, or that for other good cause the juror should be excused either temporarily or otherwise.

13. The court's procedure is neither forbidden by the statutes nor inconsistent with the goals of the statutory scheme. Rather, as the court indicated, the decision to summon a larger than usual number of potential jurors was a practical measure designed to ensure that enough people would be available to impanel a jury following a selection process where expectantly more people would be eliminated than usual. Similarly, once it became clear that all of the persons summoned could not fit into the courtroom, the court's decision to reassign those jurors who had a higher probability of being eliminated during jury selection because they had been exposed to pretrial publicity was a reasonable exercise of discretion.

erly removing a prospective juror at the prosecution's request was harmless if the jury ultimately chosen was fair and impartial). He did not object to the jury ultimately impaneled and, in fact, left one peremptory challenge unused at the time he passed the entire panel for cause.

Mara's reliance on *State v. Echineque*, 73 Haw. 100, 828 P.2d 276, *reconsideration denied*, 73 Haw. 625, 832 P.2d 1129 (1992), to support his contention that the trial court's failure to strictly follow the requirements of chapter 612 mandates retrial, is misplaced. In *Echineque*, the trial court employed the "struck jury" method of selection, which the court in *Echineque* characterized as contradicting HRS § 636–26 (1985). *Echineque*, 73 Haw. at 106, 828 P.2d at 279. Forty persons from the group of potential jurors summoned to court were randomly selected for questioning and assigned a specific place on a selection list. *Id.* The first twelve were seated in the jury box; if an individual from this group was excused for cause during questioning, that individual would be replaced by the next person in order on the list. *Id.* Thus, the parties were aware of the identity of an individual's replacement before the individual from the jury box was excused. *Id.* at 107, 828 P.2d at 279. HRS § 635–26, in contrast, required that, as individuals were excused from the jury box, replacements be chosen at random. *Id.* at 106, 828 P.2d at 279. The trial judge used the struck jury method because he believed, *inter alia*, that it was superior to the method prescribed by the statute. *Id.* This court vacated the trial court's judgment in part on the ground that trial courts were not free to contradict the statute merely because the trial judge preferred a different method. *Id.* at 107–08, 828 P.2d at 279. In contrast, the trial court in this case did not contradict the statute. Moreover, Mara does not challenge the court's procedure as a violation of HRS § 635–26 (1993), which is substantively unchanged from the statute at issue in *Echineque*, but as a violation of HRS § 635–27, discussed *infra*. Accordingly, we hold that the trial court's actions in establishing the jury venire in this case did not result in a "substantial failure to comply" with the provisions of chapter 612 and did not prejudice Mara.

**2. HRS § 635–27**

Mara also contends that the court's preclusion of the jurors from serving in this case constituted a violation of HRS § 635–27 (1993), which states as follows:

> Each party shall have the right, under the direction of the court, to examine a proposed juror as to the proposed juror's disqualifications, interest, or bias that would affect the trial of the cause and as to any matter that might tend to affect the proposed juror's verdict. Each party may introduce competent evidence to show the disqualification, interest, or bias of any juror.

This statute establishes the procedure for impaneling a jury of twelve from the pool of "proposed" jurors *in a particular case*. The fifty-one jurors that were summoned to court but assigned to other trials were not the "proposed jurors" for this particular case. Thus, HRS § 635–27 is also inapplicable.

**3. Due Process and Right to a Fair and Impartial Jury**

▪ Mara contends that the court's procedure for selecting potential jurors violated his rights to due process and an impartial jury. Mara suggests that the potential jurors assigned by the court to other trials were the type of people who would tend to keep up with current events or who may have attained higher levels of education or be of a certain gender. Thus, Mara contends that the jury who tried his case did not represent a random cross section of the community.

▪ The selection of a jury from a representative cross section of the community is an essential component of the right to an impartial jury guaranteed by the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution. *See State v. Richie*, 88 Hawai'i 19, 41, 960 P.2d 1227, 1249 (1998); *see also State v. Garrison*, 10 Haw.App. 1, 12, 860 P.2d 610, 616, *cert. denied*, 75 Haw. 581, 863 P.2d 989 (1993). In *Richie*, this court outlined the requirements needed to establish a prima

facie violation of the impartial jury requirement of the United States and Hawai'i Constitutions:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Richie*, 88 Hawai'i at 41, 960 P.2d at 1249 (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). Applying this rationale to the selection of the jury venire, Mara has not asserted or shown that a "distinctive group" was underrepresented in the pool of 100 potential jurors initially selected in this case. Other than suggesting that the persons reassigned to other courtrooms might be more educated or read more than the persons assigned to his case, or might be more likely to be of one gender than another, Mara offers nothing concerning any potentially relevant characteristic of any of the persons who were assigned to the jury venire in his case versus those assigned to venires of the other cases. Therefore, Mara has not sufficiently alleged or proven the necessary requirements to establish even a threshold showing of a violation of his right to an impartial jury. Accordingly, we hold that Mara's rights to due process and an impartial jury were not violated.

### B. *Mara's motion for continuance and mistrial*

■ Mara next contends that the trial court erred in denying his motions for continuance or, alternatively, for mistrial due to the loss of potential exculpatory evidence that was not brought to his attention before trial. As previously stated, Mara's motions were premised on the contention that the witnesses' statements regarding guns in the trunk of Akopian's vehicle were critical to his theory that he acted in self-defense because such evidence would have supported his contention that he believed Akopian was reaching for a gun when the shooting occurred. However, we do not believe that the trial court abused its discretion in denying the motions because Mara was not materially prejudiced by the unavailability of the purported witnesses.

The relevant portion of the court's self-defense instruction stated:

> The use of deadly force upon or toward another person is justified when a person using such force reasonably believes that deadly force is *immediately necessary* to protect himself on the present occasion against death or serious bodily injury. The reasonableness of the defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the defendant's position *under the circumstances of which the defendant was aware* or as the defendant reasonably believed them to be.

(Emphases added.)

Mara stated that he fired because he believed Akopian, who was seated behind the wheel of the car, was reaching for a gun. The basis of Mara's self-defense argument was thus that it was immediately necessary to shoot before Akopian retrieved a gun from the passenger compartment of the car and shot first. However, the presence of a gun in the *trunk*—of which Mara never claimed to be aware—is not probative of Mara's belief that Akopian was reaching for a gun harbored in the passenger compartment of the vehicle.

■ Mara asserts that evidence that there were weapons in the trunk of Akopian's car was relevant to show that Mara was realistic in his belief that Akopian was reaching for a gun. The inference or connection that Mara hoped to make was that someone who carries guns in his car trunk is more likely to carry or probably is carrying guns in the passenger compartment of the vehicle. Even if Mara had a witness available to present such evidence, it would have been marginal at best, as well as cumulative, insofar as there was an abundance of other evidence already before the jury that supported

Mara's contention that he believed Akopian was reaching for a gun and that he feared that Akopian might fire it at him. Mara stated that he had stolen a weapon from Akopian a few days earlier and that he knew Akopian had a previous weapons charge against him. Akopian himself acknowledged a previous weapons charge. Mara knew, and Akopian acknowledged, that Akopian had threatened him, and it was undisputed· that Akopian was angry at Mara. It was also clear that tensions between Mara and Akopian had been escalating in the days leading up to the shooting. Defense counsel also established that Akopian had a strong motivation to deny that he possessed any weapons at the time of the shooting because he could be returned to prison. Akopian's own testimony that he drove away from the scene of the shooting and then pulled over while talking on his cell phone, before summoning help for Jensen, strongly suggests that he was trying to hide something. Finally, Detective Fitchett acknowledged that there were reports that Akopian was seen "running from his car carrying something in his hands" and "handing it off to someone in the nearby area." [14] In light of all of the above, the jury was adequately apprised of the distinct possibility that Akopian possessed a gun in the passenger compartment of his vehicle and that, therefore, it would have been reasonable for Mara to believe that Akopian was reaching for a gun. On the other hand, considering all of the other evidence regarding what happened at the moment of the shooting, such as Mara's statement to police that he apparently had time to retrieve a gun from the glove box and fire while Akopian was driving away, it would not have been unreasonable for the jury to reject Mara's self-defense theory. The probative value of testimony that there were guns in the trunk was marginal at best. Therefore, it cannot be said that Mara was

materially prejudiced by his inability to present the proffered testimony. Accordingly, we hold that the trial court did not err in denying Mara's motion for continuance or for mistrial.[15]

### C. *Prosecutorial Misconduct*

The deputy prosecutor's entire rebuttal argument consisted of the following:

Ladies and gentlemen, you've heard all of the evidence. You're about to get the law. We ask you to do justice. We ask you to follow the law and arrive at a just verdict in this case.

And when you're considering the issue of reasonable doubt, one final comment on that, remember, the reasonable doubt standard which applies in all criminal trials, in every state in this country, was meant to protect an innocent person from being convicted, *it was never meant to provide a shield for a guilty man.*

Thank you.

(Emphasis added.)

Mara immediately objected to the deputy prosecutor's characterization of the reasonable doubt standard, and, at a bench conference outside of the hearing of the jury, moved for a mistrial. The court ruled that the prosecutor's argument was improper because "reasonable doubt applies to all defendants[,] and it is [the jury's] duty to determine whether he's guilty or not guilty[,]" but denied Mara's motion for mistrial, indicating that it would issue a curative instruction. The court then instructed the jury as follows:

Ladies and gentlemen, during the very last portion of the prosecutor's argument to you, he made the statement that reasonable doubt was meant to protect the innocent and not the guilty. This is an improper statement.

14. The court's instruction that statements made by bystanders should not be considered as substantive evidence of the presence of weapons pertained only to the testimony of Officer Perez. *See supra* at 9, 41 P.3d at 165. Thus, the jury was able to consider Detective Fitchett's testimony as substantive evidence.

15. Mara does not allege, nor does the evidence appear to suggest, that the prosecution deliberately withheld the potential exculpatory information.

Mara also contends that the trial court erred by failing to admit Officer Perez's testimony concerning the statements of the missing witnesses as substantive evidence. Given the above determination of the value ·of the substantive evidence, the error, if any, was harmless.

As indicated earlier, the Court will instruct you again, defendant is presumed to be innocent unless and until he is proven guilty beyond a reasonable doubt. And the burden is on the State to prove the defendant guilty beyond a reasonable doubt and that's what you're going to have to decide at the end of this case.

In addition, before sending the jury to deliberate, the court again reviewed the reasonable doubt standard. Among its instructions was the following:

You must presume the defendant is innocent of the charges against him. This presumption remains with the defendant throughout the trial of the case, unless and until the prosecution has proved the defendant guilty beyond a reasonable doubt.

The presumption of innocence is not a mere slogan but an essential part of the law that is binding upon you. It places upon the prosecution the duty of proving every material element of the offense charged against the defendant beyond a reasonable doubt.

Mara contends that the trial court erred in failing to grant his motion for mistrial because the prosecutor's statement constituted an expression of his personal belief and misstated the reasonable doubt standard. Mara contends that the prosecutor's expression of personal belief lent undue credibility to Akopian's, as opposed to his own, version of the events and therefore prejudiced him, but offers no argument to support his position. We, therefore, decline to consider whether the comment constitutes an expression of personal opinion. *See* Hawaiʻi Rules of Appellate Procedure Rule 28(b)(7) (2000) ("Points not argued may be deemed waived."). However, we agree with Mara's latter contention that the remark was an improper statement of the reasonable doubt standard.

■ The prosecutor's argument had the potential to invite the jury to misapply the reasonable doubt standard and to erode that standard. First, the argument

implies that a person who is actually guilty, in the sense of "what really happened," as opposed to the sense of having been legally determined to be guilty, is not entitled to the presumption of innocence throughout trial and deliberations. This places the cart before the horse. If the jury believes that it is to ask whether the defendant is likely actually guilty, and need only place the mantle of the presumption of innocence upon him if the answer is "no," the "presumption" is meaningless.

*United States v. Doyle*, 130 F.3d 523, 538 (2d Cir.1997).[16] Second, the argument had the potential to suggest to a reasonable juror that "she may take it upon herself to make a premature evaluation of the case and need not hold the Government to its strict burden if she is otherwise convinced of the accused's guilt." *Id.* Such a belief would obviously erode the reasonable doubt standard. *See id.* Consequently, the prosecutor's remark was improper.[17] *Accord United States v. Bridges*, 499 F.2d 179, 186 (7th Cir.1974); *Reynolds v. United States*, 238 F.2d 460, 463 (9th Cir.1956); *Gomila v. United States*, 146 F.2d 372, 373 (5th Cir.1944).

■ When the prosecutor's conduct is deemed improper, this court must then consider whether such conduct constitutes reversible error. "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. Clark*, 83 Hawaiʻi 289, 304, 926 P.2d 194, 209 (quoting *State v. McGriff*, 76 Hawaiʻi 148, 158, 871 P.2d 782, 792 (1994) (citations omitted)), *reconsideration denied*, 83 Hawaiʻi 545, 928 P.2d 39 (1996). In order to determine

16. *Doyle* and the cases cited herein actually dealt with the propriety of jury instructions rather than prosecutorial argument. However, the reasoning of these cases remains applicable in considering whether the argument is proper.

17. According to the prosecution, the remark was an attempt to convey to the jury the idea that, although the purpose of the reasonable doubt standard was to set a high burden of proof in order to protect innocent people, the burden of proof was not so high as to be equivalent to a "no doubt" standard which could be used as a "shield" for guilty people. Although this may have been the prosecutor's intent, we believe that there is too great a risk that the jury will misconstrue the remark in the manner described above.

whether the deputy prosecutor's remark amounted to reversible error, the reviewing court considers: (1) the nature of the misconduct; (2) the promptness of a curative instruction or lack of it; and (3) the strength or weakness of the evidence against the defendant. *Id.*

The prosecutor's remark was potentially prejudicial here because, as discussed above, it perverted a fundamental tenet of the criminal justice system that the prosecution must overcome the presumption of innocence by proving the defendant's guilt beyond a reasonable doubt. However, the trial court immediately corrected the prosecutor and issued a curative instruction. It is well settled that "a prosecutor's improper remarks are generally considered cured by the court's instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." *Rogan,* 91 Hawai'i at 415, 984 P.2d at 1241 (quoting *McGriff,* 76 Hawai'i at 160, 871 P.2d at 794 (brackets omitted)); *see also State v. Kupihea,* 80 Hawai'i 307, 317–18, 909 P.2d 1122, 1132–33 (1996); *State v. Pemberton,* 71 Haw. 466, 475, 796 P.2d 80, 84 (1990); *State v. Amorin,* 58 Haw. 623, 629, 574 P.2d 895, 899 (1978); *State v. Kahalewai,* 55 Haw. 127, 129, 516 P.2d 336, 338, *reh'g denied,* 55 Haw. 127, 516 P.2d 336 (1973).

Finally, consideration of the above in conjunction with the strength of the overall evidence against Mara compels the conclusion that the remark was harmless. Mara acknowledged that he fired several shots at the car in which the victim was riding; this statement was corroborated by Joseph and Akopian. Mara acknowledged that he had been looking for Akopian and approached Akopian first, abruptly turning the car around in the middle of the street to do so. Despite the fact that Mara claimed he believed Akopian was reaching for a gun, Mara also stated that he fired shots as Akopian tried to drive off and that he knew Akopian needed to use two hands to operate his standard transmission vehicle. Akopian did not have gunpowder residue on his hands. Considered in its entirety, it is difficult to believe that an isolated remark in a nearly two-week trial, for which the prosecutor was immedi-

ately rebuked and the jury twice properly instructed, seriously affected the jury's determination of Mara's guilt or innocence. *See State v. Klinge,* 92 Hawai'i 577, 596, 994 P.2d 509, 528, (stating that the defendant "fail[ed] to show that the prosecution's momentary misstatement of law amounts to reversible error"), *reconsideration denied,* 92 Hawai'i 577, 994 P.2d 509 (2000). Furthermore, the jury evidently believed that Mara did not intend to kill anyone but that he only intended to scare Akopian, which is evinced by its convicting him of the lesser offenses of manslaughter and reckless endangerment, both of which require proof of reckless, rather than intentional, conduct. The verdicts suggest that the jury was not unduly swayed by the prosecutor's rebuttal argument and misstatement of the law and gave appropriate consideration to all of the relevant circumstances. Accordingly, we hold that the prosecutor's improper comment does not constitute reversible error.

## IV. CONCLUSION

Based on the foregoing, we affirm the trial court's judgment of conviction and sentence.

## CONCURRING OPINION BY LEVINSON, J.

I agree with the judgment of the majority that Mara's conviction and sentence should be affirmed in this matter. I also generally agree with the majority's analysis, in particular, its view that the trial court's jury selection procedures did not violate any of Mara's constitutional or statutory rights.

Because, however, I was the trial judge whose use of the "struck jury" method of jury selection was at issue in *State v. Echineque,* 73 Haw. 100, 828 P.2d 276, *reconsideration denied,* 73 Haw. 625, 832 P.2d 1129 (1992), which the majority analyzes at 27–28 of its opinion, I write separately to express my belief that *Echineque* was wrongly decided. Although I employed the struck jury method because I believed that it was superior to the "strike-and-replace" method of jury selection (a belief that I continue to harbor), I did *not* "contradict [HRS § 636–26 (1985)] merely because [I] preferred a different method." *See* majority opinion at 13, 41 P.3d

at 169 (citing *Echineque,* 73 Haw. at 107–08, 828 P.2d at 279). To the contrary, the appellate record in *Echineque* reflects that I took pains to explain why I believed that "the struck jury method ... [did] not violate the letter or the spirit of HRS § 635–26" and why I did not "regard that statute as worded as being inconsistent with the use of the struck jury method[.]" *Echineque,* 73 Haw. at 104, 828 P.2d at 278 (some brackets added and some deleted) (emphasis deleted). I fully agree with the majority that "if the jury finally impaneled in the case at bar consisted wholly of qualified jurors, a mere irregularity in the process is not itself a ground for reversal, absent a showing of improper motive or prejudice." Majority opinion at 26. I respectfully suggest that the same proposition should have applied in *Echineque. See State v. Shiroma,* 9 Haw.App. 578, 579, 855 P.2d 34, 35 (1993) ("In the absence of [statutory] mandate, the 'struck jury' method would be a reasonable method to select the jury.... The jury that rendered the verdict was fair and impartial. The fact that the jury was not selected as required by HRS § 635–26(a) did not negatively or seriously affect the fairness, integrity, or public reputation of Shiroma's jury trial. Neither did it affect Shiroma's substantial rights. Therefore, the trial judge's error in the process used to select the jury was not plain error."); *but cf. Echineque,* 73 Haw. at 107, 828 P.2d at 279 ("The State argues that appellant has shown no prejudice as a result of the lower court's refusal to follow the statute.... [T]o accept the prosecution's position would be to say that ... defendants can only obtain relief where they establish that, as a result of the impanelment method, a prejudicial juror sat on the case and affected the verdict.").

## CONCURRING OPINION BY NAKAYAMA, J.

I concur with the majority opinion except as to part III.C. I agree that the prosecutor's misstatement of the reasonable doubt standard was improper, however, I believe that the majority makes unwarranted assumptions regarding what the prosecutor implied by his statements.

The rebuttal argument was improper because, as the trial court stated, the duty to prove guilt beyond a reasonable doubt is the standard applied in all criminal prosecutions. It was improper for the prosecutor to appear to differentiate between the guilty and the innocent in the application of the standard. "Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments[.]" *State v. Rogan,* 91 Hawai‘i 405, 413, 984 P.2d 1231, 1239 (1999). The *Rogan* court articulated the concern that a jury may be influenced by both the prestige and the overall capabilities of the prosecutor's office. *Id.* at 413, 984 P.2d at 1239. This concern is sufficient to find the prosecutor's rebuttal argument improper. Accordingly, I would cease analysis at the point at which we determined that although the argument was improper, the court's curative instructions sufficiently negated the potential impact.

Further, I disagree completely with the majority as to what the argument of the prosecutor implied. The majority is going far afield from an analysis of an improper argument regarding the presumption of innocence to inject a supposition that a juror would, upon hearing the argument, not require the government to prove its case, and thereby ignore the court's instructions. To foist this improper motive on the prosecutor in this case for the statement made is patently unfair and completely unnecessary in the analysis of this case.