1984 Senate Journal, at 581 (statement of Sen. Cayetano).[2]

In sum, nothing in the legislative history of HRS § 26–34(b) suggests that a holdover member may not continue to serve after failing to obtain re-confirmation by the senate. Rather, in adopting that subsection, the legislature's attention was focused on providing clear time limits on the length of a potential holdover's service: not more than eight years of total service, and not more than two regular legislative sessions as a holdover member. Accordingly, the legislative history supports a conclusion that a holdover member can serve past his or her term even if that person has not been re-confirmed by the senate, so long as that person is not disqualified by having served two terms on the same board or commission, or eight consecutive years on that board or commission.[3]

Thus, Kanuha was not disqualified pursuant to HRS § 26–34(a) because he was not "appointed consecutively to more than two terms[,]" and his membership on the LUC did not exceed eight consecutive years. And, because he was not disqualified pursuant to HRS § 26–34(a), Kanuha could "continue in office as a holdover member until a successor [was] nominated and appointed," provided that he did not "hold office beyond the end of the second regular legislative session following the expiration of the member's term of office." HRS § 26–34(b).

At the time that Kanuha voted on the Reclassification Petition, the governor had not appointed and the senate had not consented to a successor. Moreover, both of the votes at issue here occurred prior to the end of the second legislative session following the expiration of Kanuha's original term of office. Specifically, Kanuha's initial term expired on

June 30, 2009, 2005 Senate Journal, at 770, and the end of the second regular legislative session following the expiration of Kanuha's first term as a member of the LUC was May 5, 2011, the day that the legislature adjourned sine die. 2011 House Journal, at 918. Kanuha voted on the Reclassification Petition on September 23, 2010 and he voted to approve the Decision and Order on October 15, 2010. Accordingly, Kanuha was a valid holdover member and his votes on the Reclassification Petition and to approve the Decision and Order were valid. I would therefore affirm the judgment of the ICA.

320 P.3d 874

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Joseph D. VILLIARIMO, Petitioner/Defendant–Appellant.**

**No. SCWC–10–0000109.**

Supreme Court of Hawai'i.

Feb. 12, 2014.

---

Taryn R. Tomasa and Henry Ting, Honolulu, for petitioner.

Artemio C. Baxa, Wailuku, for respondent.

ACOBA, McKENNA, and POLLACK, JJ.; with NAKAYAMA, J., concurring, with whom RECKTENWALD, C.J., joins.

Opinion of the Court by ACOBA, J.

We hold that the Family Court of the Second Circuit (the court)[1] abused its discretion in denying the request for a continuance made by Petitioner/Defendant–Appellee Joseph D. Villiarimo (Villiarimo). The court failed to give reasons for its decision to deny the continuance, making the denial effectively unreviewable on appeal. Moreover, in probation modification or probation revocation hearings, courts should apply a "good cause" standard for determining whether a continuance should be granted, in recognition of the nature of probation hearings. Lastly, for purposes of determining whether a defendant has "inexcusably failed to comply with a substantial requirement imposed as a condition of the [probation] order ... [,]" Hawai'i Revised Statutes (HRS) § 706–625(3) (Supp. 2004)[2], courts should consider (1) whether the probationer's actions were intentional, and (2) whether the probationer's actions, if intentional, were a deliberate attempt to circumvent the court's probation order, considering the goals of sentencing the defendant to probation.

## I.

Villiarimo applied for a writ of certiorari (Application) from the May 8, 2010 Judgment of the Intermediate Court of Appeals (ICA), filed pursuant to its March 28, 2013 Summary Disposition Order (SDO). This court granted certiorari review of the ICA's affirmation of the order revoking Villiarimo's probation and re-sentencing him.

1. The Honorable Shackley F. Raffetto presided.

2. HRS § 706–625(3) provides:
   (3) The court shall revoke probation if the defendant has <u>inexcusably</u> failed to comply with a substantial requirement imposed as a condition of the order or has been convicted of a felony. The court may revoke the suspension of sentence or probation if the defendant has been convicted of another crime other than a felony.

## A.

On January 30, 2009, Villiarimo entered a no contest plea to a charge of sexual assault in the third degree, and the court sentenced him to five years of probation, that included 149 days of incarceration. In May 2009, Villiarimo entered into a three-month stay at the Aloha House residential dual diagnosis treatment program following a mental health or drug-related "episode" that required him to be stabilized.[3] At Aloha House, he was prescribed the medications Wellbutrin and Seroquel. By October 2009, Villiarimo was living in "regular housing" and at some point started using crystal methamphetamine. He testified that "[a]s soon as [he] started using again, [he] didn't take [his] medication anymore."

After Villiarimo tested positive for methamphetamine use, in violation of his probation, Villiarimo's probation officer (the officer), filed a written motion for modification of the terms and conditions of Villiarimo's probation on October 30, 2009 (First Motion).[4] A hearing regarding this First Motion for modification was held on November 2, 2009. That same day, the court filed a mittimus committing Villiarimo to jail, "effective immediately" for a period of eight days. On November 13, 2009, the court entered an order modifying Villiarimo's probation for "inexcusably fail[ing] to refrain from use ... [of] illegal drug[s] ... as directed by the court or probation officer."

According to Villiarimo's testimony at a later hearing, discussed below, during the time prior to the First Motion, Villiarimo had "detoxed [from meth] on [his] own at [his] house" after he was found "guilty for relapsing" but still did not take his medication. During his eight-day stay in jail, he was not given his prescribed medication. The jail

(Emphasis added).

3. Aloha House is a private, nonprofit corporation established in 1977 for the purpose of providing outpatient and residential treatment for persons addicted to alcohol and/or other drugs. *See* http://www.aloha-house.org/about.html.

4. There is no transcript of the First Motion proceedings in the record.

offered Haldol to him, but Villiarimo did not take it because he experienced adverse effects from it in the past.[5] Villiarimo was apparently discharged from jail on November 10, 2009.

## B.

On December 7, 2009, the officer filed a second written motion, requesting a modification of the terms and conditions of Villiarimo's probation and for revocation of Villiarimo's probation, pursuant to HRS § 706–625 (Second Motion). She alleged that Villiarimo: (1) failed to report to a probation officer on November 30, 2009, in violation of Condition 2 of the terms and conditions of probation; (2) failed to maintain mental health treatment services on November 19, 2009 by not attending a preliminary interview for a treatment program, in violation of Special Condition J; and (3) failed to participate in the sexual offender treatment program, because he was suspended from the program on November 30, 2009 for excessive absences and failure to accept responsibility, in violation of Special Condition P.

On December 16, 2009, Villiarimo's counsel moved for a mental examination to determine whether Villiarimo was fit to proceed under HRS § 704–404.[6] On December 22, 2009 the court suspended proceedings for an examination of Villiarimo's fitness. After all three of Villiarimo's examiners opined that he was not fit to proceed, the court found Villiarimo unfit to proceed, suspended the proceedings under HRS § 704–406(1),[7] and committed

him to the custody of the Director of Health on March 11, 2010.

That same day, Villiarimo was admitted to Hawaiʻi State Hospital (HSH). He was started on antipsychotic medication as well as medication for Attention Deficit Disorder (ADD) in mid March. On April 6, 2010, he was transferred from Unit H, the admission unit, to Unit S for further psychosocial care. Also on that day, Dr. Joan H. Fukumoto (Dr. Fukumoto) became Villiarimo's attending psychiatrist. After the unit transfer, Villiarimo did not exhibit any overt mood or psychotic symptoms, or any aggressive behavior.

On April 9, 2010, Villiarimo was evaluated for trial competence with the use of the Revised Competency Assessment Instrument (R–CAI). The results suggested that Villiarimo possessed the capacity to proceed. On April 16, 2010, Dr. Fukumoto wrote a letter to Ms. Janice Futa, prosecuting attorney, requesting a three member panel examination of Villiarimo's fitness to proceed, reporting the R–CAI results and her own findings on Villiarimo's fitness. After three examiners opined Villiarimo was fit to proceed, the court resumed proceedings on August 16, 2010.

## C.

On September 30, 2010, the court held an evidentiary hearing on the officer's Second Motion. At the hearing, Respondent/Plaintiff–Appellee State of Hawaiʻi (the State) called the officer as its witness. On cross-examination, Villiarimo's counsel asked the officer if she had an opinion on whether

---

5. The foregoing testimony was given at the evidentiary hearing concerning the Second Motion.

6. HRS § 704–404 provides in relevant part:

    (1) Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution.

    . . .

    (2) Upon suspension of further proceedings in the prosecution, the court shall appoint three qualified examiners in felony cases and one

qualified examiner in nonfelony cases to examine and report upon the physical and mental condition of the defendant.

7. HRS § 704–406(1) provides in relevant part:

    (1) If the court determines that the defendant lacks fitness to proceed, the proceeding against the defendant shall be suspended, except as provided in section 704–407, and the court shall commit the defendant to the custody of the director of health to be placed in an appropriate institution for detention, care, and treatment. . . . If the court is satisfied that the defendant may be released on conditions without danger to the defendant or to the person or property of others, the court shall order the defendant's release, which shall continue at the discretion of the court. . . .

Villiarimo was "decompensating" in October 2009.[8] However, the court only allowed the officer to testify to what she saw after inquiring whether the officer knew the "medical" meaning of decompensation:

MS. HUDSON [ (defense counsel) ]: And did you see a change in his behavior more like decompensation starting in lake October?

THE COURT: Are you s[ay]ing that in a technical sense?

MS. HUDSON: I'll say it in the—yes, in a technical sense.

THE COURT: Decompensation is a medical term. Do you know what that means from a medical point of view?

[The officer]: Well, not—if you define it for me.

THE COURT: No, she's asking whether you have an opinion about whether he had any decompensation.

[The officer]: Well, he wasn't—

THE COURT: Listen, you are not a trained medical professional. Do you know the definition of that term as used by doctors?

[The officer]: Not in that sense.

THE COURT: Well, I don't think you're in a position to offer an opinion about it. You can describe what you saw.

(Emphases added.)

Following the officer's testimony, Villiarimo's counsel requested a continuance for the purpose of calling a physician from HSH:

MS. HUDSON: Yes, your honor. And actually at this point, I think it would be helpful to have one of the Hawaiʻi State Hospital doctors, and I had not subpoenaed at this point. Perhaps I could do that via video. But I think it's important—or going to be important to present the evidence (inaudible) on fitness. I think its particularly relevant about whether he could comply with the terms and conditions.

THE COURT: Well, [we're] here for the hearing today.

MS. HUDSON: I understand, your Honor.

THE COURT: So if you want to take a break—I'm just going to take a short break. You can talk with [ ] your client, but we're going to finish this hearing today.

After the court's effective denial of the request for a continuance, Villiarimo testified. He reported that he had not been able to meet his probation requirements because his "organization wasn't there anymore." He explained that he had decompensated during his eight-day stay in jail because during that stay, he was not given Seroquel, his prescribed medication.[9] Villiarimo added that when he left jail he did not take his medication because "at that point ... [he] was already decompensating[;]" he "wasn't in [his] right mind" and "thought ... that [he] didn't need the medication when [he] actually did." He related that while decompensating, he "felt completely scattered," his "thoughts were racing," he "was hearing voices," he was "anxious all the time," and he "wasn't getting any sleep."

After Villiarimo concluded his testimony, Villiarimo's counsel again requested a continuance having Dr. Fukumoto as the witness to be called:

THE COURT: Does the defense have further evidence or witnesses?

MS. HUDSON: Well, again, your Honor, I would like to ask for a continuance because I think if—I'm actually not sure—let me ask the Court this: There was a report from the State Hospital from his treatment team that suggested a plan for him when he was released from State hospital to come back to Maui. I'm wondering if the Court got that or—

THE COURT: I don't have it in front of me.

MS. HUDSON: It was addressed to the Court. It's dated July—

---

8. "Decompensation" is a psychiatric term meaning the "failure of defense mechanisms resulting in progressive personality disintegration." *Dorland's Illustrated Medical Dictionary* 475 (32d ed. 2012).

9. Villiarimo stated that he knew the meaning of "decompensation" due to his stay in HSH.

MS. MENDES [ (Prosecuting attorney) ]: Your Honor, to the issue of violating, this is not relevant.

THE COURT: I think you're right.

MS. HUDSON: I'm just asking if the Court—

THE COURT: Do you have further evidence or witnesses?

MS. HUDSON: Yes, I would like to call Dr. Fukumoto from the State hospital, and obviously I haven't (inaudible).

THE COURT: Well, then your motion is denied. Anything else?

MS. HUDSON: No, your Honor.

(Emphases added.)

The court again denied the request for a continuance. The State asked that Villiarimo be sentenced to five years of incarceration, arguing that he had already been given "a huge chance the first time by modifying his probation" but Villiarimo "decided on his own he wanted to go take drugs" and that "he chooses [sic] not to go [to his appointments] and take [his] meds" even though "[h]e's had many people in places that he could have gone to for help."

Villiarimo's counsel responded that while Villiarimo did not meet the terms and condition of his probation, the failure was not inexcusable. She emphasized that at the time of the violations, Villiarimo was decompensating and did not understand his mental health problems.

However, the court concluded that "[Villiarimo] inexcusably failed to perform General Condition 2, report to his probation officer; Special Condition J, failure to follow through with the co-occurring disorder treatment ... [a]nd Special Condition P, failure to follow through with the Hawai'i Sex Offender Treatment Program...." Villiarimo's probation was revoked and he was sentenced to five years in prison. The court stated that "in this case the defendant was given really very good opportunities to rehabilitate himself, if that was possible, at least twice.... And yet he apparently chose to stop taking his medication and go out and use illegal drugs, and then he lost it after that.... But at some point he has to take responsibility for his behavior."

## II.

### A.

#### 1.

On October 28, 2010, Villiarimo filed a notice of appeal to the ICA. In his Opening Brief, he argued that the court abused its discretion in denying his request for a continuance to obtain the testimony of Dr. Fukumoto and in revoking his probation where the evidence presented did not indicate that he willfully and inexcusable failed to comply with the conditions of his probation. Villiarimo made the arguments that follow.

First, Villiarimo asserted that he satisfied the test adopted by the ICA in *State v. Lee*, 9 Haw.App. 600, 856 P.2d 1279 (1993), to determine whether a continuance should be granted. The test stated:

In moving for a continuance based on the unavailability of a witness, the movant must generally show that:

due diligence has been exercised to obtain the attendance of the witness, that substantial favorable evidence would be tendered by the witness, that the witness is available and willing to testify, and that the denial of the continuance would materially prejudice the defendant.

*Lee*, 9 Haw.App. at 604, 856 P.2d at 1282 (citing *United States v. Walker*, 621 F.2d 163, 168 (5th Cir.1980)); *United States v. Harris*, 436 F.2d 775, 776 (9th Cir.1970).

Due diligence in obtaining Dr. Fukumoto was exercised, according to Villiarimo, because defense counsel requested a continuance twice during the hearing; the first time immediately after the officer testified, which was when the issue of Villiarimo's mental competence was raised. Villiarimo averred that Dr. Fukumoto's testimony would have offered substantial favorable evidence because she could have explained Villiarimo's diagnosis, treatment plan, discharge plan, and prognosis, and offered her medical opinion on the effect of methamphetamine on Villiarimo and whether he was able to conform his conduct while he was on probation. Villiarimo noted that these were all matters

pertinent to whether he inexcusably failed to comply with the conditions of his probation.

Villiarimo argued that Dr. Fukumoto was available and willing to testify because in a letter she stated that she was available if there were "further questions." Additionally, Villiarimo asserted that the denial of the continuance materially prejudiced him, denying him of his constitutional right to present a defense and right to compulsory process in violation of the Sixth Amendment of the United States Constitution and article I, section 14 of the Hawai'i State Constitution.

Second, Villiarimo alleged that the evidence did not support the finding that the violations were wilful and inexcusable. According to Villiarimo, he "never stabilized after his relapse because the jail failed to give him any medication" but "had the jail provided [him] with medication, he would have stabilized and been able to comply with the conditions of [his] probation." Thus, Villiarimo maintained that the court erred in using his relapse as the basis to conclude that he inexcusably and wilfully failed to comply with the conditions of his probation.

### 2.

In its Answering Brief, the State argued, first, that the court did not abuse its discretion in denying the motion for a continuance because Villiarimo failed to meet all of the factors established in *Lee*. In the State's view, the defense had "ample" time to issue a subpeona or arrange for video testimony because four months before the hearing, Villiarimo's counsel received a copy of Dr. Fukumoto's letter, which included Villiarimo's diagnosis.

Second, the State maintained that the court correctly concluded that Villiarimo wilfully and inexcusably failed to perform conditions of his probation. According to the State, Villiarimo did not appear impaired at the hearing in regard to the First Motion for modification on November 2, 2009, and Villiarimo did not lack substantial capacity to conform his conduct to the requirements of his probation. Additionally, the State asserted, Villiarimo voluntarily chose to take drugs, and voluntary intoxication is a "gratuitous"

defense, not a constitutionally protected defense to criminal conduct.

### B.

The ICA affirmed the court's decision in an SDO on March 28, 2013. *State v. Villiarimo*, No. CAAP–10–0000109, 2013 WL 1284875, at *1 (App. Mar. 28, 2013) (SDO). Citing the *Lee* test, the ICA concluded that there was no abuse of discretion by the court in denying the continuance. *Id.* at *1–2. The ICA did not elaborate on its reasoning. *Id.* The ICA further concluded that the court did not abuse its discretion in deciding that Villiarimo inexcusably failed to comply with the conditions of his probation. *Id.* at *2. According to the ICA, in light of the principles of voluntary intoxication that " 'a mental disability excusing criminal responsibility must be the product of circumstances beyond the control of the defendant,' " *id.* (quoting *State v. Freitas*, 62 Haw. 17, 20, 608 P.2d 408, 410 (1980)), and that voluntary intoxication is not a defense to criminal conduct, *id.* (citing *State v. Souza*, 72 Haw. 246, 249, 813 P.2d 1384, 1386 (1991)), the ICA stated that "Villiarimo's voluntary intoxication ... and the psychosis[,] ... which was a direct consequence of the voluntary intoxication[,] ... cannot be a defense to his willfulness, as an indicator of his culpability, in violating the conditions of probation[.]" *Id.* Additionally, the ICA noted that "where the relapse ultimately was the admitted cause of [Villiarimo's] psychotic disorder under which [he] took the actions that violated his conditions of probation, that relapse was properly considered by the [court] in the [hearing]." *Id.* at *1.

### III.

Villiarimo raises three points of error in his Application to this court:

1. The ICA gravely erred in holding that the court did not abuse its discretion in denying Villiarimo's request for a continuance to obtain the testimony of Dr. Fukumoto, Villiarimo's treating psychiatrist from Hawai'i State Hospital, because: (1) during the hearing, the State introduced evidence that Villiarimo was experiencing psychiatric issues while on probation; (2)

when Villiarimo was taken into custody for the [Second M]otion, the proceedings were suspended because Villiarimo had been found unfit to proceed, and (3) Dr. Fukumoto would have been available to testify via video at a later date.

2. The ICA gravely erred in holding that the court did not clearly err in "consider[ing]" Villiarimo's prior use of illicit drugs to revoke his probation "notwithstanding that the same taking of illicit drugs was also the basis for a previous revocation proceeding" in violation of the double jeopardy and due process clauses of the United States and Hawai'i State Constitutions.[10]

3. There was insufficient evidence to support that Villiarimo willfully and inexcusably failed to comply with probation conditions.

(Emphases added.)

## IV.

In his Application, Villiarimo cites *State v. Mara*, 98 Hawai'i 1, 41 P.3d 157 (2002), in support of his position that the court erred in denying his request for a continuance. In *Mara*, this court held that the circuit court did not abuse its discretion in denying the defendant's request for a continuance because according to the circuit court the defendant failed to show that "the witness sought was available and willing to testify or that the denial of a continuance would materially prejudice [him]." *Mara*, 98 Hawai'i at 9, 14–15, 41 P.3d at 165, 170–71. Villiarimo alleges that, as in *Mara*, his request for a continuance to obtain a witness arose in the midst of the hearing; unlike in *Mara*, however, Villiarimo's witness was available and willing to testify and the denial of his request for a continuance did in fact result in material prejudice against him.

Villiarimo explains that Dr. Fukumoto was available and willing to testify because the case records and files that the court took judicial notice of included a letter by Dr. Fukumoto in which she stated that she was available for "further questions." From this statement and the fact that as an employee of HSH, Dr. Fukumoto routinely testifies in court proceedings, Villiarimo contends that the doctor expressed her availability and willingness to testify.

Villiarimo also relates that denying the request for a continuance materially prejudiced him because it deprived him of his fundamental rights to present a defense, to compulsory process, to effective assistance of counsel, and to due process of law.[11] He asserts that the testimony of Dr. Fukumoto was necessary to present his defense because the court prohibited the officer from testifying on Villiarimo's decompensation, and Villiarimo's testimony alone could not substantiate medically when he became mentally incompetent or what caused his incompetence.

He maintains that Dr. Fukumoto would have been able to testify on Villiarimo's treatment plan, his prognosis, and the effect of methamphetamine on him and the duration of those effects. Her testimony would have provided "substantial and favorable evidence" directly related to "whether [Villiarimo] was legally responsible for his conduct and whether involuntary intoxication was an issue."

Using the *Lee* test, the State asserts that there was no abuse of discretion because Villiarimo failed to show material prejudice. Specifically, the State explained that since voluntary intoxication is not a defense, "[Villiarimo] did not suffer manifest injustice or material prejudice because his defense [was] based on alleged mental illness [ ] caused by his voluntary taking of ... methamphetamine."

## V.

The grant or denial of a continuance is in the discretion of the trial court, and the court's ruling "will not be disturbed on appeal absent showing of abuse of that discretion." *State v. Pulse*, 83 Hawai'i 229, 239, 925 P.2d 797, 807 (1996) (internal quotation marks and citations omitted). "An abuse of discretion occurs if the trial court

---

10. In light of the disposition set forth herein, this question need not be reached.

11. In light of the proposed disposition, these constitutional issues need not be reached.

has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party-litigant." *Keahole Def. Coalition, Inc. v. Bd. of Land and Natural Res.*, 110 Hawai'i 419, 436, 134 P.3d 585, 602 (2006) (internal quotation marks omitted).

## VI.

In reviewing whether a trial court has abused its discretion in denying a request for continuance, we have recently emphasized the importance for trial courts to consider the circumstances of the case and to explain their reasoning. In *State v. Cramer*, 129 Hawai'i 296, 299 P.3d 756 (2013), this court concluded that the circuit court abused its discretion in denying the petitioner's motion for substitution of counsel and a continuance of petitioner's sentencing hearing. 129 Hawai'i at 304, 299 P.3d at 764. There, the circuit court cited only "untimeliness" as the reason for denying the request and did not offer any additional explanation for its decision. *Id.* at 302, 299 P.3d at 762. The record also disclosed that neither the circuit court nor the witnesses at the initial hearing would be inconvenienced by the request. *Id.* Additionally, the State did not take a position on the motion, and there was no apparent prejudice to the State. *Id.* Lastly, there had been only one prior continuance in the proceeding. *Id.* Under these circumstances, the majority concluded that the circuit court abused its discretion, because in denying the motion, the court should have balanced the petitioner's rights against countervailing governmental interests. *Id.*

■ Similarly, in the instant case, as set forth *supra,* the court's responses to each of Villiarimo's requests for a continuance were seemingly perfunctory. The court simply indicated that it wanted to complete the hearing in one day, and reiterated its denial after Villiarimo's testimony was complete. Where the court does not provide any justification for its decision, an appellate court cannot properly review whether the court "clearly

exceeded the bounds of reason or disregarded rules or principles of law or practice...." *Keahole Def. Coalition,* 110 Hawai'i at 436, 134 P.3d at 602. Thus, on appellate review, it is impossible to determine whether the court considered the various interests involved.

## VII.

### A.

■ The appropriate standard for determining whether to grant a continuance in a probation revocation or modification proceeding should be the "good cause" standard. Pursuant to this test, a defendant must demonstrate that he or she has "good cause" for requesting the continuance. Wright & Miller, 3B Fed. Prac. & Proc.Crim. § 832 (4th ed.). Such a standard takes into account both "the request or consent of the prosecution or defense ... [and] the public interest in [the] prompt disposition of the case." *Id.*

■ Moreover, the Rules of the Circuit Courts of the State of Hawai'i (RCCSH) requires a showing of good cause in motions for a continuance.[12] Court rules are analogous to statutes, and therefore "have the force and effect of the law." *See, e.g., State v. Arceo,* 84 Hawai'i 1, 29, 928 P.2d 843, 871 (1996). This court has not had the occasion to review RCCSH Rule 7(e), but has reviewed the standard of good cause in regard to the denial of continuances in other respects.

Hawai'i appellate courts have considered the scope of the term "good cause" in a variety of contexts. See, *e.g., Doe v. Doe,* 98 Hawai'i 144, 154, 44 P.3d 1085, 1094 (2002) (applying a "good cause" standard to a motion for a new family court trial). In construing the "good cause" standard, this court has stated "[a]s a general rule, 'good cause' means a substantial reason; one that affords a legal excuse." *See State v. Senteno,* 69 Haw. 363, 368, 742 P.2d 369, 373 (1987) (citing *State v. Estencion,* 63 Haw. 264, 267, 625

---

12. RCCSH Rule 7(e) states, in relevant part:
    A motion for continuance of any assigned trial date, whether or not stipulated to by respective counsel, shall be granted only upon a showing of good cause, which shall include a showing that the client-party has consented to the continuance.
    (Emphasis added).

P.2d 1040, 1042 (1981)). In *State v. Diaz*, for example, this court considered good cause in the context of a bail forfeiture statute. 128 Hawai'i 215, 225–27, 286 P.3d 824, 834–36 (2012). The court forfeited the petitioner's bail after he failed to appear at his arraignment. *Id.* at 219, 286 P.3d at 828. *Diaz* noted that under HRS § 804–51, " 'good cause why execution should not be issued upon the judgment' of forfeiture 'may be satisfied by the defendant ... by ... providing a satisfactory reason for his or her failure to appear when required....' " *Id.* (quoting HRS § 804–51). Because at the time of the arraignment, the petitioner was in custody in California for an unrelated criminal matter, *id.* at 226, 286 P.3d at 835, this court believed there was "no indication that the petitioner broke his recognizance intentionally, with the design of evading justice or without a sufficient cause of reasonable excuse." *Id.* at 226–27, 286 P.3d at 835–36. Considering the purposes of bail and "the circumstances of [the] case[,]" this court concluded that "good cause was established for setting aside the forfeiture judgment." *Id.*

A showing of good cause is also required to obtain a continuance in motor vehicle administrative hearings, as established by HRS § 291E–38(j),[13] the successor to HRS § 286–259(j) (repealed 2000).[14] In *Farmer v. Administrative Director of Court*, 94 Hawai'i 232, 11 P.3d 457 (2000), this court applied the HRS § 291E–38(j) "good cause" standard with respect to denial of a continuance of a driver's license revocation hearing before the Administrative Driver's License Revocation Office. 94 Hawai'i at 237, 11 P.3d at 462. In that context, this court held that " 'good cause' is defined as 'a substantial reason amounting in law to a legal excuse for failing to perform an act required by law.' " *Id.*

13.  HRS § 291E–38 states in relevant part:
     For good cause shown, the director may grant a continuance either of the commencement of the hearing or of a hearing that has already commenced.
     (Emphasis added).

14.  HRS § 286–259(j) stated in relevant part:
     For good cause shown, the director may grant a continuance either of the commencement of the hearing or of a hearing that has already commenced.

(quoting *Robison v. Administrative Director of the Courts*, 93 Hawai'i 337, 342, 3 P.3d 503, 508 (App.2000) (other citations omitted)).

### B.

The "good cause" standard for granting continuances is far more apropos in the probation modification or revocation hearing context than the *Lee* test applied by the ICA. In support of the *Lee* test, the ICA cited to a number of propositions ·indicating that continuances that delay trial are disfavored, including a quote from a federal case stating that

> "An attorney cannot reasonably expect a court to alter its calendar, and <u>disrupt a scheduled trial to which witnesses have been subpoenaed and to which the adverse party is ready</u>, simply by the filing by counsel of a last minute motion for continuance. All weight of authority is contrary to such wishful speculations."

*Id.* at 603, 856 P.2d at 1282 (emphasis added) (quoting *United States v. Chapel*, 480 F.Supp. 591, 594 (D.Puerto Rico 1979)).[15] In *Lee*, the defendant had moved for a continuance on the day of trial, and "witnesses, summoned to appear at trial, had been waiting all morning to testify...." *Id.* at 604, 856 P.2d at 1282. Thus, it was in the interest of avoiding undue delay and inconvenience <u>at trial</u> that the ICA applied the *Lee* test. This court has affirmed these concerns, stating that "[i]n deciding whether to order a continuance following a change in court-appointed counsel for an indigent defendant, the court may consider, as a factor, the need to adhere to an orderly court calendar." *State v. Torres*, 54 Haw. 502, 506, 510 P.2d 494, 497 (1973).

15.  *Walker* and *Harris*, the other federal court cases cited by *Lee*, did not involve probation proceedings. The test is now also used by the Sixth and Seventh circuits. *See, e.g., United States ex rel. Searcy v. Greer*, 768 F.2d 906, 913 (7th cir.1985); *United States v. Phillips*, 630 F.2d 1138, 1144 (6th Cir.1980). A similar test has been adopted by the Fourth and Tenth Circuits. *See, e.g., United States v. Dowlin*, 408 F.3d 647, 663 (10th Cir.2005); *United States v. Clinger*, 681 F.2d 221, 223 (4th Cir.1982).

A probation modification or revocation hearing is a substantially different type of proceeding, where the concerns prompting the ICA to adopt the *Lee* test are not present. HRS § 706–625(1) provides that the court may "reduce or enlarge the conditions of probation," after a hearing, upon "application of a probation officer, the prosecuting attorney, the defendant, or its own motion[.]" HRS § 706–625(2) sets out the procedures for such a hearing, wherein:

> The prosecuting attorney, the defendant's probation officer, and the defendant shall be notified by the movant in writing of the time, place, and date of any such hearing, and of the grounds upon which action under this section is proposed. The prosecuting attorney, the defendant's probation officer, and the defendant may appear in the hearing to oppose or support the application, and may submit evidence for the court's consideration. The defendant shall have the right to be represented by counsel. For purposes of this section the court shall not be bound by the Hawai'i rules of evidence, except for the rules pertaining to privileges.

(Emphases added.)

■ The procedures for modification or revocation of the terms and conditions of probation is intended to afford flexibility to the court. The Commentary to HRS § 706–625 provides that "[t]his section ... allows the court to relax or increase the conditions of probation. Such power is essential if the disposition is to remain flexible." (Emphasis added.) *See also, State v. Pali,* 129 Hawai'i 363, 370, 300 P.3d 1022, 1030 (2013) ("HRS § 706–625 concerns violations of probation and vests discretion in the court to decide what constitutes a violation and what remedy should apply."); *State v. Sumera,* 97 Hawai'i 430, 439, 39 P.3d 557, 566 (2002) ("[P]robation allows the court the flexibility to modify probationary conditions or to revoke probation altogether and sentence a defendant to the maximum indeterminate prison term if the defendant does not comply with the terms of probation.").

■ With this discretion comes a certain degree of procedural flexibility, evidenced by, among other things, the fact that the court is not bound by the Hawai'i Rules of Evidence (HRE) in a modification or revocation proceeding.[16] HRS § 706–625(2). Thus, such a proceeding is distinguishable from the rigors of a trial, where the court may need to consider the exigencies created by the presence of a jury. It is apparent that in articulating its test for continuances, *Lee* did not contemplate probation hearings, where no jury will ever be waiting to start or to complete the trial.

A "good cause" standard would be consistent with the concept of flexibility underlying the court's discretion to modify or revoke probation. That standard maintains procedural fairness during such hearings, by requiring that the defendant have a "substantial reason" or a "legal excuse" for requesting a continuance. This would prevent undue delay due to the whims of the defendant, while still preserving the perogatives of a court in managing its calendar.

As this case illustrates, the stakes are often high during probation revocation or modification hearings. "When the court revokes probation, it may impose on the defendant any sentence that might have been imposed originally for the crime of which the defendant was convicted." *See* HRS § 706–625(5). Thus, a revocation proceeding is akin to the initial sentencing hearing. *See State v. Durham,* 125 Hawai'i 114, 125, 254 P.3d 425 (2011) (" '[T]he question of whether the defendant should be sentenced to imprisonment or to probation is no less significant than the question of guilt.' ") (quoting Commentary on HRS § 706–604(2) (Supp.2006)). Consequently, the same procedural protections should be afforded as in any sentencing, including ensuring that the defendant is able to convey sufficient information to the court so that a fair and just decision may be made. HRS § 706–625(2) ("The prosecuting attorney, the defendant's probation officer, and the defendant may appear in the hearing to oppose or support the application, and may

---

**16.** The court would still be bound by the HRE rules pertaining to privileges. HRS § 706– 625(2).

submit evidence for the court's consideration." (emphasis added)); *see also Durham,* 125 Hawai'i at 123, 254 P.3d at 434 (holding in the context of a probation revocation hearing that " '[i]n any system which vests discretion in the sentencing authority, it is necessary that the authority have sufficient and accurate information so that it may rationally exercise its discretion.' " (quoting *State v. Lau,* 73 Haw. 259, 262, 831 P.2d 523, 525 (1992))).

A defendant then should be allowed a fair opportunity to supplement or controvert the State's evidence at the revocation hearing. Cf. HRS 706–604(2) ("The court shall furnish to the defendant or the defendant's counsel and to the prosecuting attorney a copy of the report of any pre-sentence diagnosis or psychological, psychiatric, or other medical examination and afford fair opportunity, if the defendant or the prosecuting attorney so requests, to controvert or supplement them." (emphases added)). Thus, it is critical to recognize situations where a substantial reason exists for the defendant's continuance request and to consider the request accordingly.

### VIII.

■ Applying the good cause standard to the instant case, it is evident that Villiarimo provided a "substantial reason" or "legal excuse", *see Senteno,* 69 Haw. at 368, 742 P.2d at 373, for the proceedings to be temporarily suspended to obtain Dr. Fukumoto's testimony. The issue of Villiarimo's mental health was raised in the testimony of the officer; however, as she was not a "trained medical professional" the court prohibited her from testifying as to whether Villiarimo was decompensating during the time of the probation violations at issue and thus did not intentionally violate the terms of his probation. Villiarimo's testimony was the only testimony on decompensation at the proceeding, but he could not medically substantiate the cause of the decompensation and its likely effect on his behavior.

Dr. Fukumoto's testimony could have informed the court of whether Villiarimo's condition affected his conduct during the time of the violations, and if not, the reason why it did not. This testimony would have been directly relevant to Villiarimo's defense that there was insufficient evidence to demonstrate that he wilfully and inexcusably failed to comply with the terms and conditions of his probation. *See State v. Quelnan,* 70 Haw. 194, 767 P.2d 243 (1989) (holding that a defendant has the right to "present a potentially meritorious defense" at a probation hearing). Therefore, Villiarimo had "good cause" for requesting a continuance to obtain Dr. Fukumoto's testimony. Because this testimony was at the heart of Villiarimo's defense to the probation violations, the court's error in failing to grant a continuance for Villiarimo to obtain Dr. Fukumoto's testimony was not harmless. Consequently, the court abused its discretion in denying Villiarimo's request for a continuance.

### IX.

For purposes of remand, the court's ultimate decision to revoke Villiarimo's probation is briefly discussed. HRS § 706–625(3) specifies that "[t]he court shall revoke probation if the defendant has inexcusably failed to comply with a substantial requirement imposed as a condition of the [order setting forth the terms and conditions of probation.]"

### A.

■ As noted, Villiarimo had alleged at the probation hearing that his failure to satisfy the probation terms and conditions occurred as a result of his mental health issues, and were therefore excusable. The court did not accept this defense, and the ICA upheld the court's decision on the basis that "Villiarimo's voluntary intoxication . . . and the psychosis . . . cannot be a defense to his wilfulness, as an indicator of culpability, in violating [ ] the conditions of his probation." *Villiarimo,* 2013 WL 1284875, at *2.

"Inexcusable" has not been defined in the statute, but the plain meaning of "inexcusable" is "being without excuse or justification." *Merriam Webster's Collegiate Dictionary* 597 (10th ed. 1993) (emphasis added). This court has considered the significance of the term "inexcusably" in HRS § 706–625 on several occasions. For example, in *State v.*

*Nakamura,* 59 Haw. 378, 581 P.2d 759 (1978), this court characterized "inexcusably" as a "wilful and deliberate attempt . . . to circumvent the order of the court." 59 Haw. at 381, 581 P.2d at 762. The defendant was sentenced to five years probation, with the condition that he remain at a drug rehabilitation program until he was clinically discharged. 59 Haw. at 378, 581 P.2d at 761. Upon release from the correctional facility, the defendant went home to visit his mother prior to entering the rehabilitation program. *Id.* at 379, 581 P.2d at 761. The drug rehabilitation program rejected him on this basis, and this court determined that the program's rejection was arbitrary. *Id.* at 380, 581 P.2d at 762. In considering whether the defendant had "inexcusably failed to comply" with the condition of probation, *Nakamura* held that "[t]he defendant's enrollment at [the program], following this brief visit [to his mother], was made impossible by [the program's] arbitrary rejection." *Id.* As such, *Nakamura* concluded that "[t]here was no wilful and deliberate attempt on his part to circumvent the order of the court." *Id.* at 381, 581 P.2d at 762.

In *State v. Wong,* 73 Haw. 81, 829 P.2d 1325 (1992), the defendant argued that a willful or intentional failure to comply with a term of probation was required before a defendant's probation could be revoked. 73 Haw. at 82, 829 P.2d at 1326. In that case, the defendant was convicted of sexual abuse and sentenced to fifteen consecutive weekends of incarceration and five years probation, and as a condition of his probation he was to submit to treatment in a residential or outpatient mental health program until clinically discharged. *Id.* at 82–83, 829 P.2d at 1326. While on probation, the defendant was arrested for the offense of Abuse of Household Member and was convicted of Driving Under the Influence. *Id.*

The State filed a motion to revoke probation, and at the hearing the defendant told the court that he had been accepted into a residential drug and alcohol treatment program at the Hawai'i Addiction Center (HAC). *Id.* The court decided not to revoke his probation, but instead resentenced him to a new term of probation with the additional condition that he maintain residential treatment in HAC until clinically discharged. *Id.* HAC then terminated the defendant from the program when it found out about his original sexual abuse conviction, and the State filed another motion for revocation, alleging that the defendant had failed to maintain treatment at HAC, although apparently not through any willful or intentional act of his own. *Id.*

*Wong* then construed *Nakamura,* and held that in addition to the defendant's wilfulness, *Nakamura* had also considered the rehabilitative and protective objectives of probation when making its decision as to whether the defendant's violation was "inexcusable." *Id.* at 85, 829 P.2d at 1327. In so concluding, *Wong* read HRS § 706–625 in conjunction with HRS § 706–606 (Supp.1991), which provides the sentencing objectives that a court should consider when deciding whether to impose probation. *Id.* at 86, 829 P.2d at 1328 (citing HRS § 1–16 (1985)) (providing that "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other."). As a result, *Wong* held that while a defendant's wilfulness is an indicator of culpability, the court should also consider the legislature's protective and rehabilitative purposes, as set forth in HRS § 706–606, in considering whether a defendant's violation of probation was "inexcusabl[e]." *Id.* at 86–87, 829 P.2d at 1328.

Under this standard, *Wong* held that the court could consider the defendant's dangerousness in considering whether his probation violation was inexcusable. *Id.* at 87, 829 P.2d at 1328. Underlying *Wong*'s holding was the notion that a construction of "inexcusable" to mean only "wilful" would "mak[e] it impossible for the court to revoke probation where there exists no appropriate rehabilitative programs in the community or where the defendant poses an unreasonable threat of harm to the community, so long as the defendant has not intentionally violated any terms of probation." *Id.*

In *Quelnan,* this court based its decision to revoke the defendant's probation on two grounds, one of which was that the defendant had misrepresented his employment status and source of income to his probation officer.

70 Haw. at 198, 767 P.2d at 246. The officer testified at the probation hearing that the defendant had reported that he was employed as a driver at Sida Taxi, but had not worked there for a number of months. *Id.* The officer further testified that the defendant's taxi driver's license had expired, he had been denied a reissuance, and that he continued as a taxi driver by picking up some fares independently. *Id.* at 201, 767 P.2d at 247.

*Quelnan* held that "there [was] serious doubt as to whether [the d]efendant inexcusably failed to comply with the change in employment status condition of probation." *Id.* (citation omitted). This court observed that "[a]rguably, but for [the d]efendant's failure to gain reissuance of his taxi driver's license, [the d]efendant would still be gainfully employed with Sida as a taxi driver. Based on the record, the sole reason [the d]efendant was denied reissuance was due to his then pending gambling indictment, which was later dismissed." *Id.*

*Quelnan* went on to note that "[the d]efendant's employment status during his probationary period did not evidence conduct wilfully and deliberately subversive of exemplary probationary behavior[,]" and that "[i]n essence, [the d]efendant's overall whereabouts was readily ascertainable, and known to the probation department." *Id.* at 201, 767 P.2d at 247–48. Thus, the defendant's failure to report his change in employment status was found to be excusable. *Id.*

### B.

Based on this court's prior case law, it appears that the most appropriate definition of "inexcusably" in HRS § 706–625(3) is a "willful and deliberate attempt ... to circumvent the order of the court." *Nakamura*, 59 Haw. at 381, 581 P.2d at 762. This standard requires both an intentional act on the part of the defendant ("willful" [17]), and a deliberate attempt by him or her to circumvent the probation order, taking into consideration the significance of the defendant's action with respect to the court's order and goals of probation ("to circumvent the order of the

court"). See *id.*; see also *State v. Huggett*, 55 Haw. 632, 639, 525 P.2d 1119, 1124 (1974) (remanding for a rehearing to enable the court to determine whether "considering the totality of the circumstances, [the defendant's] post-sentencing conduct was wilfully and deliberately subversive of exemplary probationary behavior."). The cases described above appear to generally consider these two factors when determining whether a defendant's probation should be modified or revoked. Thus, in this case, on remand, the court should consider, with respect to each violation, whether (1) Villiarimo's actions were intentional, and (2) whether his actions, if intentional, were a deliberate attempt to circumvent the court's probation order, considering the goals of sentencing the defendant to probation.

### X.

In light of the foregoing, for purposes of continuance requests at probation modification and revocation hearings, the "good cause" standard applies. Inasmuch as Villiarimo satisfied the "good cause" standard in his request for a continuance, the court abused its discretion in denying his request. Further, in determining whether, pursuant to HRS § 706–625(3), Villiarimo "inexcusably failed to comply with a substantial requirement imposed" by the probation order, the court must apply the test articulated herein. Therefore the ICA's May 8, 2013 judgment on appeal affirming the court's September 30, 2010 order of revocation of probation and resentencing is vacated, and the case remanded for further proceedings.

Concurring Opinion by NAKAYAMA, J., in which RECKTENWALD, C.J., joins.

I concur with the majority's holding that the family court abused its discretion in denying Villiarimo's request for a continuance of his resentencing hearing. However, I write separately because I disagree with the majority's conclusion that "good cause" is the appropriate standard for the granting of a continuance to obtain the testimony of an

---

17. *Black's Law Dictionary* defines "willful" as "[v]oluntary and intentional, but not necessarily malicious." *Black's Law Dictionary* 1737 (9th ed. 2009) (emphasis added).

unavailable witness in the probation revocation or modification hearing context. While it is appropriate for the court to apply a more lenient standard in the hearing context than in the trial context, the court should apply the *Lee* test to determine whether a continuance is warranted.[1]

The majority concludes that the court should apply the "good cause" standard when determining whether to grant a continuance in a probation revocation or modification proceeding. Majority at 217, 320 P.3d at 882. Pursuant to the good cause standard, the court must balance the "good cause" demonstrated by the defendant for requesting the continuance against the public interest in a prompt resolution of the case. Majority at 217, 320 P.3d at 882. The majority stresses that the Rules of the Circuit Courts of the State of Hawai'i (RCCSH) mandate that a continuance only be granted upon a showing of "good cause." Majority at 217, 320 P.3d at 882. The majority also cites to the numerous other contexts in which Hawai'i appellate courts have applied a good cause standard. Majority at 217, 320 P.3d at 882.

Hawaii's courts have not previously used the good cause standard in the unavailable witness context. Rather, the ICA has developed a list of factors termed the *Lee* test.

In moving for a continuance based on the unavailability of a

> witness, the movant must generally show that: "[1] <u>due diligence</u> has been exercised to obtain the attendance of the witness, [2] that <u>substantial favorable evidence</u> would be tendered by the witness, [3] that the witness is <u>available and willing to testify</u>, and [4] that the denial of the continuance would <u>materially prejudice</u> the defendant."

*State v. Lee*, 9 Haw.App. 600, 604, 856 P.2d 1279, 1282 (1993) (emphasis added) (quoting *United States v. Walker*, 621 F.2d 163, 168 (5th Cir.1980)); *see also State v. Rivera*, No. 30080, 2012 WL 5831177, at *2 (Haw.App. 2012) (SDO); *State v. Jacobson*, No. 28863, 2009 WL 977302, at *1 (Haw.App.2009) (SDO). Primarily, the *Lee* factors guard against unnecessary delay during trial. The *Lee* test gives considerable weight to due

diligence, witness availability, willingness of the witness to testify, and the materiality of the testimony sought. These factors place a heavy burden on the party seeking the continuance to demonstrate that the delay in the trial is unavoidable and the testimony of the absent witness is essential.

This court has not explicitly adopted the Lee test. However, we have often applied some combination of these factors in evaluating a motion for a continuance to obtain the testimony of an unavailable witness at trial. In *State v. Valmoja*, 56 Haw. 452, 540 P.2d 63 (1975), we held that the trial court abused its discretion in denying a motion for a continuance where the defendant exercised due diligence in attempting to obtain the testimony of the absent witness and the materiality of the witness's evidence was apparent. 56 Haw. at 454, 540 P.2d at 64. In *State v. Mara*, 98 Hawai'i 1, 41 P.3d 157 (2002), we concluded that the circuit court did not abuse its discretion in denying the defendant's request for a continuance where the defendant failed to show that he was materially prejudiced by his inability to present the unidentified witness's testimony. 98 Hawai'i at 14–15, 41 P.3d at 170–71.

This case is unlike our previous unavailable witness cases because it concerns a probation revocation or modification proceeding rather than a trial. As the majority notes, an evidentiary hearing does not function under the strictures of a trial. There is a greater degree of procedural flexibility in a probation revocation or modification proceeding; the court is not bound by the Hawai'i Rules of Evidence (HRE) or by the time constraints created by the presence of a jury. Majority at 218, 320 P.3d at 884. Consequently, a greater degree of flexibility in the granting of a continuance to obtain the testimony of an unavailable witness is warranted. But, this is insufficient justification for a wholesale abandonment of the *Lee* factors.

It is undisputed that the court must balance the movant's reasons for requesting the continuance against the public interest in a

---

**1.** Given my conclusion that the family court abused its discretion in denying Villiarimo's request for a continuance of his resentencing hear-

ing, I do not reach the other issues addressed by the majority.

speedy resolution of the proceeding. I recommend that instead of merely considering whether the movant has demonstrated "good cause," courts should also consider the *Lee* factors: whether (1) due diligence has been exercised to obtain the witness's attendance; (2) the witness would provide substantial favorable evidence; (3) the witness is available and willing to testify; and (4) the denial of the continuance would materially prejudice the defendant. These factors should be interpreted more leniently in the probation revocation or modification proceeding context, where the public interest in a speedy resolution is far less weighty than during trial.